**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

LYLE FIKSE,

          Plaintiff,

vs.

LINN HALL, in his Official Capacity as
Director Of State Of Iowa Third Judicial
District Department of Corrections
Services,

          Defendant.

No. C 08-4071-MWB


**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

———————————

**TABLE OF CONTENTS**

*I.* *INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A.* *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B.* *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*II.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   *A.* *Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . . . . 10
   *B.* *Fikse's Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      *1.* *The circumstantial evidence paradigm* . . . . . . . . . . . . . . . . 18
      *2.* *Analysis—plaintiff's showing of pretext* . . . . . . . . . . . . . . . 20

*III.* *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# I. INTRODUCTION AND BACKGROUND

## A. Factual Background

The summary judgment record reveals that the following facts are undisputed. Plaintiff Lyle Fikse was born on October 21, 1950. He has been employed as a Residential Officer ("RO") at the Sheldon Residential Treatment Facility by the State of Iowa Third Judicial District Department Of Correctional Services ("3rd JDDOCS") since September 1999. Defendant Hall is the Director of the 3rd JDDOCS and has held that position since 1977. As a RO, Fikse is responsible for the daily routine of approximately 30 residents, including security, supervising ongoing activities in the building, and checking individuals in and out of the facility.

Between 1972 and 1981, Fikse was probation officer in Modesto, California for Stanislaus County. As a probation officer in Modesto, Fikse started as a juvenile probation officer and was then transferred to an "intensive supervision officer" position where he supervised approximately thirty offenders who were identified to have substance abuse problems. After working in that position, Fikse was an adult presentence investigation report writer, and then was assigned a caseload of approximately 90 to 100 offenders. Fikse also worked in the adult supervision department where he supervised approximately 300 offenders. Fikse was never disciplined as a probation officer in California.

Fikse recalls applying for approximately fourteen Probation/Parole Officer ("PPO") positions that have come open in the 3rd JDDOCS since he started there in 1999, and has applied for every PPO position that has come up since September, 2005. PPO II positions within the 3rd JDDOCS are "generalist" positions, meaning that individuals in those positions are expected to cover a particular geographic area and do investigations for the

court or supervise parolees or probationers.[1] PPO III positions have the same general expectations as PPO IIs, except they are hired for a specific purpose, such as taking on high risk clients. During the hiring process for PPO positions, Hall ultimately makes the decision on who to hire. Hall remembers personally interviewing Fikse at least two times for PPO positions. Hall is familiar with Fikse's resume and has stated that Fikse meets all the qualifications for either PPO II or PPO III positions based on both are education and experience. Due to Hall's familiarity with Fikse's resume, he is aware that Fikse has previous experience as a probation officer in California. Hall's assessment of Fikse as a RO with the 3rd JDDOCS is "very good." Hall elaborated, "[h]is evaluations have been good. I--I think he--he's--From the feedback I get, he's responsive to the management. His supervisor has always been supportive of him." Hall's Dep. at 16, Fikse's App. at 9. Hall acknowledges that Fikse's immediate supervisor as a RO, Maureen Hansen, has given Fikse a "high recommend" for promotion from RO to a PPO position, and that Fikse submitted a letter from Hansen when he applied for PPO positions. Fikse believed that in each case he was a better candidate than the person hired for the position.

On October 13, 2000, Philip Welte, age 25, was hired as a PPO I by the 3rd JDDOCS. Fikse was 50 years old at the time. Welte had no prior probation experience. Hall was unable to give a specific reason why Welte was hired over Fikse, other than noting that Welte had "treatment experience" from his experience working at the Boys and Girls Home.

In March 2001, Jamey Beltman, age 25, was hired as a PPO I by the 3rd JDDOCS. Fikse, however, did not apply for this position. In November 2005, Pam Ebel was hired as a PPO by the 3rd JDDOCS. Ebel was 50 years old at the time, and Fikse was 55. On

---

[1]The 3rd JDDOCS no longer has a position classified as a PPO I.

December 12, 2005, Kaia Downing, age 32, was hired for a PPO III position by the 3rd JDDOCS. Fikse was 55 at the time of Downing's hiring. Hall was unable to state why Fikse was not hired for this position.

Beginning in August of 2006, the 3rd JDDOCS interviewed both internal and external candidates for three positions: Probation/Parole Officer ("PPO") III-Intensive Supervision; PPO III-Global Position Supervisor; and, PPO II. The following interview process was employed in filling these positions, with Hall ultimately making the decision on who to hire for the opening. After reviewing the candidates' resumes, each of the candidates were asked to answer identical interview questions. Tom Frisch and Steve Middleton, both 3rd JDDOCS Probation/Parole Supervisors, would interview both the internal and external applicants while Hall, due to health problems, only interviewed the external candidates. The interview team would then meet to discuss the candidates. The interview team had not previously discussed the candidates. Frisch and Middleton would reveal their top candidates for the vacancies. After which, Hall would reveal his top candidates and then the interview team would discuss the candidates' strengths and weaknesses. Some of the factors considered in evaluating the candidates included: seniority within the 3rd JDDOCS; work experience; educational background; special skills; and, interview responses and demeanor. Hall accepted the recommendations of both Frisch and Middleton concerning these three positions and formally offered the chosen candidates the positions.

The first position, PPO III-Intensive Supervision, was offered to Mark Covey, an external applicant. Covey was 33 years old, with nine years of experience as a law enforcement officer. He had a bachelor's degree in sociology with an emphasis in criminal justice as well as a master's degree in administrative studies. Hall was unable to recall specifically why Covey was hired. Middleton recalled that he believed that Covey had the

skills and experience that would transfer well into home visits and employer checks with offenders coming out of prison because of the associated risks with the caseload for that position. Middleton was impressed with the manner in which Covey's presented himself as well as his interview examples of how he would utilize his past experience in supervising offenders. Frisch felt that because it was an intensive parole supervision position, he wanted someone who would be confident and feel comfortable in conducting home visits outside of normal office hours. Covey's law enforcement background struck Frisch as making him capable of meeting those needs and handling any problems that might arise given the nature of the position. Covey's masters degree was also a deciding factor for Frisch.

The second position, PPO III-Global Position System Monitor, was offered to Craig Hartman, age 47, who had been employed by the 3rd JDDOCS since 1984 as a PPO II. Hartman has a bachelor's degree in criminal justice. Middleton thought Hartman was well-qualified for the position because he had twenty-two years of experience working in the 3rd JDDOCS and believed the fact that he had already been a PPO II would serve him well in fulfilling the responsibilities of the PPO III position. Middleton also felt that Hartman's overall knowledge of the district, relationships he had built with law enforcement agencies, and knowledge of community agencies would be beneficial and an asset. Frisch felt Hartman's experience and working relationships with other agencies would help the success of the Global Positioning System program. Frisch also thought it was a bigger jump to go from a RO position, such as that held by Fikse, to a PPO III than to move from a PPO II position, such as that held by Hartman, to a PPO III. Fikse, in contrast, had only RO experience within the 3rd JDDOCS and had only been with the 3rd JDDOCS for seven years.

The third position, PPO II, was offered to Todd Hruska, an external applicant, age 31. Hruska was employed by area addiction treatment centers for six years as a behavioral issues/chemical dependency counselor, a position that included supervisor responsibilities, and was an active participant in the Woodbury County Drug Court. Hruska has a bachelor's degree in criminal science. Middleton recalled that Hruska's responses during his interview struck him as well thought and in-depth. Middleton also thought that Hruska's treatment background would translate well with the position's responsibilities. Frisch also noted Hruska's treatment background, as well as his supervisory responsibilities.

As a result of offering the PPO III-Global Position System Monitor job to Hartman, Hartman's PPO II position with the 3rd JDDOCS was open and needed to be filled. This position was filled by Keith Iverson, who was 41 years old. Iverson had worked in the Sheldon facility as a RO with Fikse since 1999, although he was only part-time. Hall was unable to state why Fikse was not hired for this position and acknowledged that Iverson had no probation experience. Middleton noted that Iverson had volunteered for specialized training in motivational interviewing and he had trained other staff, activities which were above and beyond his normal job duties. As a result, Middleton thought that Iverson would bring those skills into the PPO II position. Iverson's willingness to be a motivational interviewing trainer was important to Middleton. In addition, Middleton thought that Iverson had a very good interview with well thought out responses. Frisch thought that, because Iverson had volunteered to be a trainer for motivational interviewing, he was someone willing to go above and beyond his normal job duties for the 3rd JDDOCS.

While recognizing that Fikse was a good employee, Hall's stated reasons for not choosing Fikse for any of the positions was that he felt that Fikse's personality could be

overpowering or aggressive and, as a result, his personality did not address the needs of a client as well as the other candidates for these four positions. Hall also stated that Fikse was more rigid with clients and this would not result in an optimal supervision position. Finally, Hall stated that other candidates' personality traits seemed better suited for the positions. Middleton and Frisch have stated that Fikse was overly confident and did not directly answer the interview questions appropriately. Fikse would discuss how things had been done in the past and appeared somewhat unwilling to change the offender supervision style. Middleton and Frisch recalled that when Fikse was asked how he would handle a certain situation, he would respond that he was already trained but did not explain how he would handle the situation.

On May 17, 2007, Nick O'Brien, age 25, was hired as a PPO II. Fikse was 56 years old at the time of O'Brien's hiring. Hall does not recall the circumstances of O'Brien's hiring. He does not think he took part in the interviews for that position. On May 18, 2007, Adam Timmins, age 27, was hired as a PPO II by the 3rd JDDOCS. Timmins's work experience was as a highway patrol officer in South Dakota. Hall also does not recall the circumstances of Timmins's hiring. On September 20, 2007, Jennica Jackes, age 27, was hired as a PPO II by the 3rd JDDOCS. Her work experience was in drug treatment, not probation.

Deborah Ann Campbell was employed by the 3rd JDDOCS in Sioux City, Iowa, from 1998 until 2008, as Community Program Monitor. Hall was the director of the 3rd JDDOCS during Campbell's employment there and was responsible for her termination. Campbell was 56 years old at the time of her termination. Before working for the 3rd JDDOCS, from 1994 to 1998, Campbell had an office at the Iowa Department of Corrections and worked as the Batterer's Education Program Lead Coordinator for Iowa's Third Judicial District's sixteen-county area. This position was funded by a grant and

shared between the Iowa Department of Corrections and Family Services, Inc., of Sioux City, Iowa. In late 2006, Campbell and several co-workers asked for a meeting with Hall in order to discuss morale issues in the 3rd JDDOCS. On December 7, 2006, in a meeting attended by Hall and Campbell, Hall made a comment to Campbell.[2] Campbell remembers the comment as being about her age and that she did not like change. Hall remembers stating, "'as we all get older sometimes change becomes difficult' or words to that effect." Hall's Second Aff. at ¶ 2, Defendant's Supplemental App. at 6. Campbell went to her union representative and told her what Hall had stated to her. Campbell alleges that in meetings with Hall on January 8, 2007, January 22, 2007, and February 21, 2007, Hall brought up Campbell's age, commenting that she didn't like change because she was older and it was harder for older people to adjust to change. Hall denies that he brought up Campbell's age in either the January 8, 2007, or January 22, 2007, meetings. He contends that Campbell, and not him, raised the issue of her age during the February 21, 2007 meeting. Campbell complained about Hall's alleged comments and filed a grievance through the union on June 29, 2007. Her grievance was dismissed as being untimely, and no action was taken against Hall.

On September 5, 2006, Fikse filed a complaint with the Iowa Civil Rights Commission ("ICRC"), which was cross-filed with the Equal Employment Opportunity Commission ("EEOC"), alleging that he had been discriminated against based on his age. After Fikse submitted his complaint with the ICRC, and during the ICRC's investigation of his complaint, Fikse notified the ICRC that he had been passed over for promotion again

---

[2]It is contested whether other individuals attended this meeting. Hall recalls meeting individually with Campbell and four other employees. Campbell recalls a meeting being granted to her and several co-workers.

in favor of younger workers.  On May 30, 2008, the EEOC issued a right to sue letter to
Fikse.

## B.  Procedural Background

On August 19, 2008, Fikse filed his original Complaint against the 3rd JDDOCS,
alleging age discrimination in violation of the ADEA.  Specifically, Fikse alleges that he
was and continues to be employed by the 3rd JDDOCS as a residential officer at the
Sheldon Residential Treatment Facility in Sheldon, Iowa; that he is over forty years of age;
that he has repeatedly sought and been denied promotions to the position of probation
officer; and that younger workers have been hired or promoted instead, despite his
experience, good performance reviews, and seniority.  Therefore, Fikse alleges willful age
discrimination by the 3rd JDDOCS in violation of the ADEA, and seeks back pay and
benefits, front pay and benefits, training, promotions, and seniority; damages for past and
future suffering, emotional distress, loss of enjoyment of life, and other non-pecuniary
losses; liquidated damages for willful discrimination; costs, expenses, and attorney fees;
and such other relief as the court deems proper.

On December 8, 2008, Fikse filed an Amended Complaint in which he added Hall,
in his official capacity as the director of the 3rd JDDOCS.  In addition to adding the new
defendant, Fikse's Amended Complaint added a new paragraph to his prayer asking the
court to enjoin defendant Hall permanently from engaging in or continuing practices,
polices, customs, and usages shown to be violative of the ADEA and requiring that Fikse
be promoted to the position of probation officer.

Both the 3rd JDDOCS and Hall filed motions to dismiss.  The court granted the 3rd
JDDOCS's motion because the 3rd JDDOCS has Eleventh Amendment sovereign immunity
to plaintiff Fikse's ADEA claim.  Defendant Hall's Motion To Dismiss was denied as to

plaintiff Fikse's claim for injunctive relief but granted as to any claim for compensatory or other relief. The court ordered that the case be restyled Lyle Fikse v. Linn Hall, in his Official Capacity as Director Of State Of Iowa Third Judicial District Department of Correctional Services and granted Fikse until July 13, 2009, to file a Second Amended Complaint asserting only his claim for prospective injunctive relief against defendant Hall in his official capacity. On July 13, 2009, Fikse filed his Second Amended Complaint in which he seeks injunctive relief against Hall, in his official capacity, from age discrimination in violation of the ADEA.

Defendant Hall filed a Motion for Summary Judgment on October 26, 2009. In his motion, Hall asserts that Fikse cannot establish a violation of the ADEA because he cannot offer substantial evidence that Fikse's age was a motive in the relevant employment decisions. Fikse filed a timely resistance to Hall's Motion for Summary Judgment on November 24, 2009, contesting the ground for summary judgment advanced by Hall and arguing that there are genuine issues of material fact in dispute which preclude the granting of summary judgment on his claim. On December 7, 2009, Hall filed a timely reply brief.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. FED R. CIV. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the

expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484,

1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c),

the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal

theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. FED. R. CIV. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgment is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

The court recognizes "that summary judgment is disfavored in employment discrimination cases." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005); *see Woods v. Perry*, 375 F.3d 671, 674 (8th Cir. 2004) ("[S]ummary judgment should be used sparingly in employment discrimination cases . . . ."); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) ("[S]ummary judgment should seldom be used in employment discrimination cases."). This exceptional deference shown the nonmoving party is warranted, according to the Eighth Circuit Court of Appeals, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence . . . .," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir.

1999)), and because "intent" is generally a central issue in employment discrimination cases. *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)); *see Simpson*, 425 F.3d at 542 (noting summary judgment is disfavored in employment discrimination cases because they are "'inherently fact-based.'" (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 806 (8th Cir. 2003))). Nonetheless, this exercise of judicial prudence "cannot and should not be construed to exempt" from summary judgment, employment discrimination cases involving intent. *Christopher*, 137 F.3d at 1071 (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995)). The fact remains that "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The court will apply these standards to the Hall's Motion for Summary Judgment.

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove today—nearly forty years after the

passage of the ADEA—than during ADEA's earlier evolution. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII). This court's experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against summary judgment.

## B. Fikse's Claim

Under the ADEA, it is unlawful for an employer to "fail to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1); *see Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2347 (2009); *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009). "A plaintiff may establish her claim of intentional age discrimination through either direct evidence or indirect evidence." *Id.*; *see Ward v. Int'l Paper Co.*, 509 F.3d 457, 460 (8th Cir. 2007); *Spencer v. Stuart Hall Co.*, 173 F.3d 1124, 1127 (8th Cir. 1999). Each of these types of ADEA claims has slightly different elements. *Spencer*, 173 F.3d at 1127 (citing *Bevan v. Honeywell, Inc.*, 118 F.3d 603, 609 n.1 (8th Cir. 1997)). Here, Fikse has not provided direct evidence of discrimination, therefore, his ADEA claim, based on circumstantial evidence, is analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973).[3] *See King*, 553 F.3d at 1160; *Loeb v. Best Buy, Inc.*, 537 F.3d 867, 872 (8th Cir. 2008); *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 871 (8th Cir. 2008); *Riley v. Lance, Inc.*, 518 F.3d 996, 1000 (8th Cir. 2008); *Morgan v. A.G. Edwards & Sons, Inc.,* 486 F.3d 1034, 1042 (8th Cir. 2007);

---

[3] "'Direct evidence is that which demonstrates a specific link between the challenged employment action and the alleged animus.'" *Yates v. Rexton, Inc.*, 267 F.3d 793, 799 (8th cir. 2001) (quoting *Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 835 (8th Cir. 2000)); *see Browning v. President Riverboat Casino-Mo., Inc.*, 139 F.3d 631, 634 (8th Cir. 1998) ("'Direct evidence'" has been interpreted as "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the factfinder to find that that attitude was more likely than not a motivating factor in the employer's decision.") (quoting *Thomas v. First Nat'l Bank*, 111 F.3d 64, 66 (8th Cir. 1997), which in turn quotes *Kriss v. Sprint Communications Co.*, 58 F.3d 1276, 1282 (8th Cir. 1995)).

*Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999).[4] The parties hotly dispute, however, whether the record generates a genuine issue of material fact as to circumstantial evidence of age discrimination under the *McDonnell Douglas* burden-shifting analysis. Therefore, the court will first set out the circumstantial evidence paradigm, followed by an analysis and resolution of Hall's Motion for Summary Judgment.

### 1.    The circumstantial evidence paradigm

Under *McDonnell Douglas* and its progeny, the employment discrimination plaintiff has the initial burden of establishing a *prima facie* case of discrimination by producing evidence that would entitle the plaintiff to prevail unless contradicted and overcome by evidence produced by the defendant. *Tuttle v. Missouri Dept. of Agriculture*, 172 F.3d 1025, 1029 (8th Cir. 1999); *White v. McDonnell Douglas Corp.*, 985 F.2d 434, 435 (8th Cir. 1993). The importance of the *prima facie* showing is that it creates the inference that the employer terminated the plaintiff for an impermissible reason. *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir. 1995). As to the first stage of the *McDonnell Douglas* burden-shifting analysis, the Eighth Circuit Court of Appeals has explained that to establish a prima facie case of intentional discrimination under the ADEA, a plaintiff must show that:

---

[4]In its decision in *Gross*, the United States Supreme Court noted that: "the Court has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context." *Gross*, 129 S. Ct. at 2349 n. 2; *see Baker v. Silver Oak Senior Living Mgmt. Co., L.C.*, 581 F.3d 684, 688 (8th Cir. 2009) (quoting *Gross* and noting the Supreme Court's indecision on the issue). Because the Eighth Circuit Court of Appeals has, and given the absence of any further direction from the Supreme Court, this court must follow controlling Eighth Circuit precedent, which applies the *McDonnell Douglas* framework to indirect evidence of discrimination ADEA claims. *See Baker*, 581 F.3d at 688; *King*, 553 F.3d at 1160; *Loeb*, 537 F.3d at 872; *Fitzgerald*, 521 F.3d at 871; *Morgan,* 486 F.3d at 1042; *Breeding*, 164 F.3d at 1156.

(1) [he] was a member of the protected group (at least 40 years old); (2)[he] was qualified to perform the job; (3)[ he] suffered an adverse employment action; and (4) circumstances permit an inference of discrimination.

*Bearden v. Int'l Paper Co.*, 529 F.3d 828 (8th Cir. 2008); *see also Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 642 (8th Cir. 2008); *Morgan v. A.G. Edwards & Sons, Inc.*, 486 F.3d 1034, 1039-40 (8th Cir. 2007); *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004); *Mayer v. Nextel West Corp.,* 318 F.3d 803, 806-07 (8th Cir. 2003).[5] "Once established, the prima facie case entitles the plaintiff to a rebuttable presumption that intentional discrimination played a role in the adverse employment action." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776 (8th Cir. 1995); *accord Tuttle*, 172 F.3d at 1029; *Krenik v. County of Le Sueur*, 47 F.3d 953, 958 (8th Cir. 1995); *Kobrin v. University of Minn.*, 34 F.3d 698, 702 (8th Cir. 1994).

If a *prima facie* case is established, the burden then shifts to the employer to rebut the presumption by producing evidence that the employer made the questioned employment decision for a legitimate, non-discriminatory reason. *Tuttle*, 172 F.3d at 1029; *White*, 985 F.2d at 435. The employer's explanation of its actions must be "clear and reasonably specific," *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981), but the employer's burden of production has nonetheless been held to be "exceedingly light." *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir. 1994) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)). If the employer meets this burden of production, the legal presumption that would justify a judgment as a matter of law based

---

[5]An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998).

on the plaintiff's *prima facie* case "simply drops out of the picture," and the plaintiff bears the burden of persuading the finder of fact that the proffered reasons are pretextual and that the employment decision was the result of discriminatory intent. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

The Supreme Court has made clear that the ultimate inquiry is whether the employer intentionally discriminated against plaintiff. *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *Tuttle*, 172 F.3d at 1029; *United States v. Johnson*, 28 F.3d 1487, 1494 (8th Cir. 1994), *cert. denied*, 513 U.S. 1098 (1995). However, if the defendants' proffered reasons are rejected, the trier of fact may infer the ultimate fact of intentional discrimination. *St. Mary's*, 509 U.S. at 510. ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

### 2. *Analysis—plaintiff's showing of pretext*

Because the parties do not dispute that Fikse has established a prima facie case of age discrimination and that Hall has, in turn, produced evidence that the questioned employment decisions were made for a legitimate, non-discriminatory reasons, the court need only consider the validity of Hall's proffered legitimate, non-discriminatory reasons for not promoting Fikse and whether Hall's reasons were pretexts for age discrimination *See Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894, 898 (8th Cir. 2004) (instructing that the showing of pretext necessary to survive summary judgment "requires more than merely discrediting [defendants'] proffered reason for the adverse employment decision. [Plaintiffs] must also prove that the proffered reason was a pretext for age discrimination.") (quoting *Sprenger*, 173 F.3d at 1128); *see Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (noting that to create a factual issue on pretext "the

ultimate question is whether the plaintiff presents evidence of 'conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in [the employer's] decision. . . .'") (quoting *Feltmann v. Sieban*, 108 F.3d 970, 975 (8th Cir. 1997)).  In order to accomplish this, a plaintiff must present some evidence beyond the evidence put forth in step four of his *prima facie* case.  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 147-48.

Fiske contends that the following evidence shows pretext.  First, Fikse points to his qualifications for a PPO position compared to a number of the individuals who were hired or promoted to PPO positions in 2006 and 2007.  At the time Fikse applied for PPO positions with the 3rd JDDOCS, he had already served nine years as a probation officer in Modesto, California.  As a probation officer in Modesto, Fikse had started off as a juvenile probation officer, and was then transferred to an "intensive supervision officer" position where he supervised approximately thirty offenders with substance abuse problems.  After working in that position, Fikse was an adult presentence investigation report writer.  He was then given a caseload of approximately 90 to 100 offenders who were incarcerated, and later worked in the adult supervision department where he supervised approximately 300 offenders.  Fikse was never disciplined while working as a probation officer in California.  In addition to his experience as a probation officer, Fikse has an exemplary work history within the 3rd JDDOCS, working as a RO at the 3rd JDDOCS's Sheldon facility since 1999.  As a RO, Fikse is responsible for the daily routine for approximately thirty residents, including security, supervising ongoing activities in the building, and checking individuals in and out of the facility.  Hall's assessment of Fikse

as an employee of the 3rd JDDOCS is "[v]ery good." As Hall elaborated, "[h]is evaluations have been good. . .[f]rom the feedback I get, he's responsive to the management. His supervisor has always been supportive of him." Hall's Dep. at 16, Fikse's App. at 9. Fikse's immediate supervisor as a RO, Maureen Hansen, has given Fikse a "high recommend" for promotion from RO to a PPO position, and has provided Fikse with a letter of recommendation to submit with his applications for PPO positions.

In comparison, five of the individuals hired for PPO positions by the 3rd JDDOCS did not have experience as probation officers and four had no work experience within the 3rd JDDOCS. Each of these individuals were younger, some significantly younger, than Fikse. Keith Iverson was promoted to the position of PPO II in September 2006. Iverson had no probation experience and, although he had worked as a RO in the 3rd JDDOCS's Sheldon facility with Fikse since 1999, Iverson had been employed in that position on a part-time basis. He was 41 years old at the time while Fikse was 56. Hall was unable to state why Fikse was not hired for this position. Todd Hruska was also hired as a PPO II in September 2006. He was even younger than Iverson, being 31 years old at the time of his hiring. Hruska's experience was not in probation but as a behavioral issues/chemical dependency counselor in area addiction treatment centers. Mark Covey was hired as a PPO III in September 2006. Covey was 31 years old. His experience was, again, not in probation, but as a police officer. Hall was unable to recall specifically why Covey was hired. On May 18, 2007, Adam Timmins was hired as a PPO II at the age of 27. Timmins's experience was as a highway patrol officer in South Dakota, not in probation. Hall, again, was unable to state why Timmins was hired. Nick O'Brien, age 25, was also hired on May 18, 2007, for a PPO II position. O'Brien had worked as an intern in the 3rd JDDOCS for seven weeks and had experience working as a juvenile probation officer, in Nebraska, from November, 2006, until being hired by Hall. Hall was unable to state why

Timmins was hired.   On September 20, 2007, Jennica Jackes was hired as a PPO II. Jackes was 27 years old at the time.   Like Hruska, Jackes's experience was in drug treatment, not probation.   The fact that Fikse, who is in his fifties, was repeatedly passed over for promotion to a PPO position, despite his superior experience in probation and having an exemplary work history in the 3rd JDDOCS, in favor of younger candidates, most of who were in their 20's and 30's, gives rise to a strong inference that Hall harbored a discriminatory attitude toward older employees and desired to hire younger workers to fill open PPO positions within the 3rd JDDOCS.   As the Eighth Circuit Court of Appeals observed in *MacDissi v. Valmont Industries, Inc.,* 856 F.2d 1054 (8th Cir. 1988), in a similar context, "[t]his fact is certainly not conclusive evidence of age discrimination in itself, but it is surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow, and proceed to assess the employer's explanation for this outcome." *Id.* at 1058.

Finally, Fikse points to a number of comments made by Hall to Campbell which he claims are evidence of Hall's age animus and are, therefore, relevant to the issue of pretext.   Campbell claims that during a meeting with Hall on December 7, 2006, Hall commented on her age and that she did not like change.   Campbell also claims that in meetings with Hall on January 8, 2007, January 22, 2007, and February 21, 2007, Hall brought up Campbell's age, commenting that she didn't like change because she was older and it was harder for older people to adjust to change.   Campbell was in her mid-fifties at the time of Hall's comments.   While Hall denies he made such statements, the court must view all the facts in the light most favorable to the nonmoving party, here Fikse, and give him the benefit of all reasonable inferences that can be drawn from the facts.   *Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)).   While the alleged comments by Hall, were not made during the decisional

process, they, nonetheless, are "circumstantial" evidence of an age discriminatory animus in this case. This is because such comments could well be viewed as synonymous to one of Hall's proffered non-discriminatory reasons for not promoting Fikse, namely that he was too "rigid" in dealing with clients. Similar comments that an employee was unwilling and unable to "adapt" to change, have been found to support an inference of age discrimination. *See Bienkowski v. Am. Airlines, Inc.,* 851 F.2d 1503, 1507 n.4 (5th Cir. 1988). The court concludes that these statements, when considered in conjunction with Fikse's prima facie case and showing of pretext, give rise to an inference of intentional discrimination. *See Fischer v. Pharmacia & Upjohn*, 225 F.3d 915, 923 (8th Cir. 2000). Accordingly, the court finds that Fikse has presented sufficient evidence to raise a genuine issue for trial on the ultimate question of age discrimination *vel non*. *See Riser v. Target Corp.,* 458 F.3d 817, 821 (8th Cir. 2006). Therefore, Hall's Motion for Summary Judgment is denied.

### III. CONCLUSION

For the reasons stated above, because the court concludes that genuine issues of material fact have been generated in this case, defendant Hall's Motion for Summary Judgment is denied.

**IT IS SO ORDERED.**

**DATED** this 25th day of January, 2010.

Mark W. Bennett
_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA